**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MAURICE GERELL BROUGHTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:20-CV-399-RAH-CSC** |
| | ) | |
| | ) | |
| **WARDEN MONICA McCOY, et. al.,** | ) | |
| | ) | |
| **Defendants.** | | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I. INTRODUCTION

Maurice Gerell Broughton, an indigent state inmate, filed this 42 U.S.C. § 1983 action on June 12, 2020, containing vague and unintelligible claims relating to the general claim that he was subjected to unconstitutional conditions while housed at Easterling Correctional Facility. (Doc. 1). Thereafter, the Court ordered him to file an Amended Complaint and advised him that this Amended Complaint would supercede the original complaint. (Doc. 6).

In his Amended Complaint, filed August 4, 2020, he claimed that the Defendants acted with deliberate indifference to his health and safety when they placed a COVID-19 infected inmate in a dorm with him and other non-infected inmates. (Doc. 8 at pp. 3-4). He also alleged that the dorm housing rules, including lack of outdoor time and access to the law library, cleaning supplies, and pill calls, violated his Eighth Amendment right to be free from cruel and unusual punishment. (Doc. 8 at p. 4). Finally, he claimed that these deprivations, resulting from the lock down of Dorm G-1, were imposed by Defendants in retaliation for an excessive force lawsuit which had been previously filed. *Id.* He named as Defendants Correctional Officers, Lt. J. Shepard, Captain N.

Lawson, Lt. McCovery, Lt. Jennifer McCovery, Captain Danzey, Sgt. Lovejoy, Sgt. Omar Boynes, Sgt. Stanford, Warden Monica McCoy, Sgt. Borders, and Officer T. Jones, Lt. D. Jones. (Doc. 8). He sought immediate release from custody[1], the closure of Dorm G-1 until it meets standards, and money damages. (Doc. 8 at p. 5).

He filed another Amended Complaint seeking to amend the relief sought in his complaint. (Doc. 15). Specifically, he demanded that dorms G-1 and G-2 be closed until the water was made safe and hygienic, until the bathroom area could be redone, the building sprayed for insects and rodents, until proper staffing was provided, and proper access to outdoor recreation, the snack line, law library, chapel and weight area were also provided. (Doc. 15 at pp. 1, 2). Thereafter, Plaintiff filed another Amended Complaint adding new Defendants, Warden John Crow and Captain Clay Jenkins. (Doc. 46). He also filed an additional Amended Complaint seeking to amend the relief sought against Warden Crow and Captain Jenkins to include monetary damages in the amount of four million dollars. (Doc. 51). Plaintiff has been transferred from Easterling and is now housed at Bibb Correctional Facility. (Doc. 71).

The Defendants filed special reports (Docs. 29, 63) and supplements thereto (Docs. 39, 65), which included relevant evidentiary materials in support of these reports, specifically affidavits which addressed the claims presented by Broughton. In these documents, the

---

[1] The law is clear; a claim for release from custody may not be addressed in a 1983 action. Rather, this claim for relief may only be addressed in a petition for habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). Indeed, in *Heck*, the Supreme Court held that claims challenging the legality of a prisoner's conviction or sentence are not cognizable in a 42 U.S.C. § 1983 action "unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus" and complaints containing such claims must therefore be dismissed. *Heck* v. *Humphrey*, 512 U.S. 477, 489 (1994). Thus, *Heck* confirms that "[h]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." 521 U.S. 481, citing *Preiser,* 411 U.S. 475 (1973). Therefore, summary judgment is due to be granted on Plaintiff's cursory claim for release from custody.

Defendants deny that they violated Plaintiff's constitutional rights in any manner. After reviewing the special reports and exhibits, the court issued an order on, January 19, 2021, requiring Broughton to file a response to the Defendants' special report, supported by affidavits or statements made under penalty of perjury and other evidentiary materials. This order specifically cautioned that "**unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." (Doc. 32 at p. 3).

Broughton filed responses to this order. (Docs. 18, 45 and 66.). In his responses, he filed an affidavit of another inmate, Robert Jones, who alleges that on June 3, 2020, he tested positive for COVID-19, and was then kept in Health Care for a week before he was returned to Dorm-G. (Doc. 18-2 at p. 1). Jones does not offer any independent documentation supporting his allegation that he tested positive for COVID-19. (Doc. 18-2 at pp. 1-2). Broughton also filed a copy of an inmate request slip complaining of restriction from the law library, which contained a reply from Defendant Joseph Danzey stating that the "the law library has not been restricted. The law clerks can bring your requested documents to you.". (Doc. 18-1 at p. 1). He also filed copies of his own affidavits, restating the allegations in his complaints about constitutional violations, including being housed with an inmate who tested positive for COVID-19. (Doc. 45-1 at pp. 1-29). Finally, he filed his certificate of completion of a ADOC program entitled "Thinking for a Change." (Doc. 66 at p. 4).

Pursuant to the directives of the order entered on January 19, 2021, the court now treats the Defendant's special report and supplements thereto as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the Defendants.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Moore's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Broughton has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the Defendants.

## III. FACTS

Broughton alleges that he has been subjected to cruel and unusual punishment because Defendants subjected him to unconstitutional conditions of confinement when, among other reasons, Broughton was exposed to COVID-19. Specifically, Broughton alleges that an inmate, who tested positive for COVID-19, was placed in Dorm G-1 where he and other inmates were housed who were not positive for COVID-19. Broughton also alleges that in retaliation for an excessive force claim he filed, his dorm was placed on lockdown and he was denied access to the law library, time in the yard, pill call and cleaning supplies. (Doc 8, at pp. 3-4).

Ruth Naglich, Associate Commissioner for Health Services for the ADOC, filed an affidavit with numerous attachments demonstrating the ADOC's efforts including, information gathering, policy making and information disseminating during the COVID-19 epidemic, which recount the procedures developed to keep inmates safe and healthy during this crisis. (Docs. 29-13 at pp. 1-31, 29-14 at pp. 1-9. and 29-15 at pp. 1-26). Indeed, the record reflects that from the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID -19 pandemic, both system wide and at Easterling. (Docs. 29-12 at pp. 1-6; Doc. 29-13 at pp. 1-31; Doc. 29-14 at pp. 1-9; Doc. 29-15 at pp. 1-26). Further, ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. (Doc . 29-13 at pp. 1-16; Doc. 29-12 at pp.4-6). Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure. (Doc. 29-13 at pp.3-4).

In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID - 19. Decisions on whether to test an inmate rested with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol. (Doc. 29-13 at pp. 9-10).

Quarantine and testing occurred based on a three (3) tiered system. (Doc. 29-13 at pp. 10-13). Level one, also known as "watchful wait," requires inmates

suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID - 19. Level one does not require testing. (*Id.*). Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. Level three requires medical quarantine for any inmate who tests positive for COVID-19. (*Id.*). Moreover, the undisputed evidence shows that the Defendants followed the protocol developed by the Alabama Department of Corrections and Wexford Health to keep Broughton and all inmates safe from COVID-19. (Docs. 29-1, 29-2, 29-3, 29-4, 29-5, 29-6, 29-7, 29-8, 29-9, 29-10, 29-11 and 29-12 at pp. 1-6).

It is undisputed that Dorm G1 was placed on "watchful wait"-- Level 1 quarantine on June 3, 2020, when Inmate Robert Jones was taken to Health Care, where he claims he tested positive for COVID-19 and was held in Health Care for a week before his return to the dorms. (Docs. 18-1 at p. 2 and 18-2 at p.1). Although there is no medical evidence in the record confirming Jones' positive COVID-19 result, the Court will accept Jones' allegation of his June 3, 2020, positive result. However, based upon the affidavit of inmate Robert Jones, there is no evidence that Broughton was ever exposed to COVID-19 as he claims. (*Id.)* Rather, inmate Jones acknowledges that following his COVID-19, he was kept in Health Care for a week before he was returned to Dorm-G. (Doc. 18-2 at p. 1).

Indeed, Defendant Warden Crow denies placing any infected inmate in Plaintiff's dorm or any other dorm and testifies that such a placement would have been contrary to ADOC and Easterling policy. Furthermore, Crow confirms that Dorm G1 was never

denominated to be a quarantine or isolation area. (Doc. 29-12 at p. 6). He further explains that ADOC policy allowed inmates to be discharged from medical isolation or quarantine only after the medical staff has concluded they are not positive for COVID-19. *Id.* Also, all named Defendants confirm they followed ADOC policy and deny that they ever placed Plaintiff in contact with any inmate infected with COVID-19. They also confirm that a dorm under a "watchful wait" protocol continued to have yard call with inmates housed their same dorm. (Doc. 29-1 thru 12).

Broughton also filed a copy of a June 11, 2020, grievance complaining of restriction from the law library. (Doc. 18-1 at p. 1). The face of the grievance contained a reply from Defendant Joseph Danzey stating, "the law library has not been restricted. The law clerks can bring your requested documents to you.." *Id.* Additionally, all Defendants deny retaliating against Broughton for any reason. (Doc. 29, Exs. 1-15).

Importantly, Broughton makes no allegation that he contracted COVID- 19. Further, no medical staff member reported that Broughton contracted COVID- 19. (Doc. 29-12 at p. 6). Neither has any staff member reported that Broughton exhibited (or claimed to have) symptoms. (*Id.*)

## IV. DISCUSSION

### A. OFFICIAL CAPACITY CLAIMS

To the extent Broughton requests monetary damages from the Defendants in their official capacities, they are entitled to absolute immunity. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted). Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala*., 916 F.2d 1521, 1525 (11th Cir. 1990)). In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

Thus, the court will now address the Plaintiff's claims brought against Defendants in their individual capacities.

**B. CLAIMS FOR INJUNCTIVE RELIEF**

Broughton demanded that dorms G-1 and G-2 be closed until the water was made safe and hygienic, until the bathroom area could be redone, the building sprayed for insects and rodents, until proper staffing was provided, and proper access to outdoor recreation, the snack line, law library, chapel and weight area were also provided. (Doc. 15 at pp. 1, 2). Plaintiff has been transferred from Easterling and is now housed at Bibb Correctional Facility. (Doc. 71).

Under Eleventh Circuit precedent "a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief." *Smith v. Allen,* 502 F. 3d 1255, 1267 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas,* 563 U.S. 277 (2011); see also, *Zatler v. Wainwright,* 802 F. 2d 397, 399 (11th Cir. 1986) (per curium.) Here, Broughton seeks injunctive and declaratory relief demanding the closing of dorms G-1 and G-2 until the alleged deprivations, listed above, could be remedied. Because Broughton is no longer incarcerated in Easterling, his instant claims for injunctive and declaratory relief are moot. (Doc. 71). Accordingly, the Court concludes that the Defendants' Motions for Summary Judgment are due to be granted as to Broughton's claims for injunctive and declaratory relief.

**C. CLAIMS BASED ON DELIBERATE INDIFFERENCE**

Plaintiff claims that Defendants acted with deliberate indifference toward him when they placed a COVID-19 infected inmate in a dorm with him and other non-infected inmates. (Doc. 8 at pp. 3-4). He also alleged that due to his dorm being placed on "watchful wait", he was deprived of outdoor time and access to the law library, cleaning supplies, and pill calls, which violated his Eighth Amendment right to be free from cruel and unusual punishment. (Doc. 8 at p. 4). The law

is clear; only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46. Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349). Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

Further, a prison official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004). In order to violate the Eighth Amendment, the risk of harm from the condition must be "so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk." *Id.* (quotation marks and citation omitted) (emphasis in original). As with deliberate indifference claims, to demonstrate an Eighth

Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834.

Besides the objective component, the Plaintiff must satisfy a subjective prong by showing that the Defendant acted with deliberate indifference. *Chandler,* 379 F. 3d at 1289-90. This does not require that the prison official purposefully acted to cause harm, but it does involve something beyond mere negligence. *Id.* The Eleventh Circuit has recently clarified under the subjective prong, that a Plaintiff must demonstrate a Defendant "acted with more than gross negligence" to demonstrate deliberate indifference. *Wade v. McDade*, 67 F. 4th 1363, 1373 (11th Cir. 2023). Indeed, the Defendant must know of and disregard an "excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id; see also, Wade*, 67 F. 4th at 1374.

**1. Covid-19 Contact Claim**

Plaintiff claims that the Defendants acted with deliberate indifference to his health and safety when they placed a COVID-19 infected inmate in a dorm with him and other non-infected inmates. (Doc. 8 at pp. 3-4). However, the undisputed facts show that following inmate Robert Jones' COVID-19 test, he was kept in Health Care for a week before he was returned to Dorm-G. (Doc. 18-2 at p. 1).[2]

Indeed, Defendant Warden Crow denies placing any infected inmate in Plaintiff's dorm or any other dorm and testifies that such a placement would have been contrary to ADOC and Easterling policy. Furthermore, Crow confirms that Dorm G1 was never

[2] There is no medical evidence in the record confirming inmate Jones' alleged positive COVID-19 result.

denominated to be a quarantine or isolation area. (Doc. 29-12 at p. 6). He further explains that ADOC policy allowed inmates to be discharged from medical isolation or quarantine only after the medical staff has concluded they are not positive for COVID-19. *Id.* Also, all named Defendants confirm they followed ADOC policy and deny that they ever placed Plaintiff in contact with any inmate infected with COVID-19. (Doc. 29-1 thru 29-12).

Importantly, there is no allegation that Inmate Broughton contracted COVID- 19. Further, no medical staff member reported that Inmate Broughton contracted COVID-19. (Doc. 29-12 at p. 6). Neither has any staff member reported that Inmate Broughton exhibited (or claimed to have) symptoms. (*Id.*) Accordingly, the Court concludes that Plaintiff has failed to adduce facts from which the Court could conclude that any Defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" to Plaintiff due to the alleged contact with any COVID-19 infected inmate. (*Id); see also, Wade*, 67 F. 4th at 1374. Thus, summary judgment is due to be granted on this claim.

**2. Other Conditions Claims**

Nowhere in any of his filings does Plaintiff allege that his dorm's placement on "watchful wait" status created a serious risk of to him and that Defendants disregarded this known risk. (*Id).* Rather, he makes the cursory claim that because of the "watchful wait" status placed on his Dorm, he was denied access to outdoor time, the law library, pill call and cleaning supplies. However, he provides no meaningful explanation as to how often these deprivations occurred or how these alleged deprivations detrimentally affected his health or safety. Moreover, he makes no allegations that the Defendants were aware of these alleged deprivations or of any resulting harm to him. However, even assuming Defendants were aware and failed to act, Plaintiff's cursory allegations

fail to create a question of fact as to whether Defendants acted with gross negligence in ensuring Plaintiff was not denied access to pill call or cleaning supplies. *Wade*, 67 F. 4th at 1374.

Additionally, the undisputed record evidence demonstrates that both the law library and outdoor time were accessible to Plaintiff. Indeed, all Defendants confirm that a dorm under a "watchful wait" protocol continued to have yard call with inmates housed in their same dorm. (Doc. 29-1 thru 29-12). Further, the June 11, 2020, grievance filed by Broughton complaining of restriction from the law library confirms on its face that Defendant Joseph Danzey replied, "the law library has not been restricted. The law clerks can bring your requested documents to you." (Doc. 18-1 at p. 1). Thus, the court concludes the facts, as stated by the Plaintiff, do not rise to the level required by law to survive the entry of summary judgment for Defendants based their alleged deliberate indifference to unconstitutional conditions.

**D. RETALIATION CLAIMS**

The plaintiff alleges that the Defendants retaliated against him when they locked down Dorm G1 because of a previously filed excessive force lawsuit, thereby depriving him of outdoor time and access to the law library, cleaning supplies, and pill calls. (Doc. 8 at p. 4). To proceed on a claim for retaliation and withstand the entry of summary judgment, the Eleventh Circuit has held that

> "an inmate must establish these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)."

*Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his

exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Smith*, 532 F.3d at 1278-1279 citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct ... was a 'motivating factor'" behind the adverse action of the defendant. *Mt. Healthy*, 429 U.S. at 287. Merely alleging the ultimate fact of retaliation, however, is insufficient. *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Taking the plaintiff's allegations as true, as the court must on summary judgment, the court concludes the plaintiff fails to state a claim for retaliation based upon his claims that he was deprived of outdoor time and access to the law library, cleaning supplies, and pill calls due to his filing of an excessive force lawsuit. Based upon the discussion at pp. 9-14, *supra*, the Court concludes the Plaintiff has failed to demonstrate that the Defendants violated his constitutional rights to be free from cruel and unusual punishment due to the conditions of his housing while on "watchful wait"[3]. Furthermore, Court also concludes the Plaintiff has failed create a question of fact as to retaliatory motive due to the undisputed record confirming the Defendants' actions were supported by COVID-19 protocol. Thus, summary judgment is due to be granted in favor of the Defendants on this retaliation claim.

---

[3] Indeed, Plaintiff's alleged deprivation under "watchful wait" is analogous to a claim for retaliation based upon a plaintiff's placement in segregation. The law is clear; a plaintiff has no "liberty interest in freedom from confinement in administrative segregation." *Al-Amin v. Donald,* 165 Fed. Appx, 733, 737 (11th Cir. 2006) ("Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison, does not implicate liberty interests.") Thus, a clam for retaliation, based upon the alleged deprivations to Plaintiff during the "Watchful Wait" period, fails because Plaintiff has not demonstrated that the restrictions to Dorm G-1 were not substantially similar to other Dorms placed on a COVID-19 "watchful wait" status.

**E. CLAIMS BASED ON RESPONDEAT SUPERIOR**

To the extent that Plaintiff claims Warden John Crow, or another supervisory Defendant, is liable to him in their supervisory position based on a theory of respondeat superior for the alleged actions or inactions of any other Defendants, those claims fail. The law is well established; supervisory officials cannot be held liable in § 1983 actions under any theory of respondeat superior or vicarious liability. *See, Belcher v. City of Foley,* 30 F.3d 1390, 1396-97 (11th Cir. 1994).

Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949. Thus, liability for the alleged unconstitutional conditions could attach to Defendant Warden Crow if he either "personally participate[d] in the alleged

unconstitutional conduct or [if] there is a causal connection between [her] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Indeed, a causal connection maybe established either when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or when (2) "a supervisor's custom or policy. . . result[s] in deliberate indifference to constitutional rights" or when (3) "facts support an inference that the supervisor directed the subordinate to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (Citations omitted). Based upon the Defendants' undisputed affidavit testimony and the court's careful review of the Plaintiff's allegations, the court concludes that the Plaintiff's claims against Defendant Warden Crow, and any other Defendant Plaintiff alleges had supervisory responsibly, fail because the Plaintiff has not demonstrated the COVID-19 policy resulted in deliberate indifference to his constitutional rights. *See*, *supra*, pp. 9-14. Neither has Plaintiff come forward with any facts demonstrating "a history of widespread abuse" of any sort, which violated his constitutional rights." *Cottone*, 326 F.3d at 1360. Nor has he demonstrated any facts from which this court could infer that Warden Crow or any supervisory Defendant "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id*. Accordingly, summary judgment is due to be granted on Plaintiff's claims based upon supervisory liability because he has failed to create a question of fact as to causation.

For the above stated reasons, it is the **RECOMMENDATION** of the Magistrate Judge that

1. The Defendants' motions for summary judgment (Docs. 29, 39, 63, and 65) be GRANTED.

2. Judgment be GRANTED in favor of the Defendants.

3.  This case be DISMISSED with prejudice.

4.  Costs be taxed against the Plaintiff.

On or before **August 1, 2023**, the plaintiff may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which he objects. Frivolous, conclusive or general objections will not be considered by the District Court. The plaintiff is advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 18th day of July, 2023.

  /s/ Charles S. Coody  
CHARLES S. COODY  
UNITED STATES MAGISTRATE JUDGE